UNITED STATES of America

v.

Giuseppe GAMBINO, a/k/a "Joe," Rosario Naimo, a/k/a "Saro," a/k/a "Don Saro," a/k/a "Sarino," a/k/a "Sal," a/k/a "Casimiro DiLorenzo," a/k/a "Barry Beiner," Lorenzo Mannino, a/k/a "Lore," Francesco Inzerillo, a/k/a "Frank," a/k/a "Ciccio," Matteo Romano, Emanuele Adamita, a/k/a "Manuele," a/k/a "Mario DiLorenzo," a/k/a "Stephan Milazzo," Joseph La-Rosa, a/k/a "Little Joe," a/k/a "Cardillo," Salvatore LoBuglio, a/k/a "Toto," a/k/a "the engineer," Giuseppe D'Amico, a/k/a "Pino," a/k/a "Joe," Salvatore D'Amico, Francesco Cipriano, a/k/a "Frank," a/k/a "Ciccio," a/k/a "Francino," Salvatore Candela, a/k/a "Toto," Paolo D'Amico, Carmelo Guarnera, and John Doe, a/k/a "Sasha," Defendants.

No. 6th "S" Cr. 919 (PKL).

United States District Court,
S.D. New York.

Jan. 25, 1990.

Otto G. Obermaier, U.S. Atty., S.D. New York, New York City (Frances M. Fragos, Andrew C. McCarthy, of counsel), for U.S.

Judd Burstein, Edward Panzer, New York City, for defendant Gambino.

Charles Carnesi, Salvatore Russo, Brooklyn, N.Y., for defendant Mannino.

Ira J. Friedman, Brooklyn, N.Y., for defendant Inzerillo.

Gerald L. Shargel, Gail E. Laser, New York City, for defendant Romano.

Martin G. Fogelson, New York City, for defendant Adamita.

Golub & Dunn, New York City, Mitchell A. Golub, for defendant LaRosa.

Edward M. Kratt, New York City, for defendant LoBuglio.

Martin Geduldig, Hicksville, N.Y., for defendant Giuseppe D'Amico.

Thomas D. White, New York City, for defendant Cipriano.

Culleton & Marinaccio, Bronx, N.Y., James Culleton, for defendant Candela.

Brown, Berne & Serra, Bronx, N.Y., Wesley M. Serra, for defendant Guarnera.

## ORDER & OPINION

LEISURE, District Judge:

On December 14, 1989, the Grand Jury returned the sixth superseding indictment (hereinafter, the "indictment," the "pending indictment," or the "1989 indictment")[1] against the defendants in this case. The evidence presented to the Grand Jury was the result of a long-term investigation by the federal government into an international organization known as "the mafia" or "la cosa nostra." According to the government, this organization, or system of organizations, is responsible for the importation and distribution of large quantities of narcotics in violation of federal law. To supplement its income from the narcotics trade, the organization also allegedly participates in gambling, loansharking, and extortion. The government charges that murder and other acts of violence are carried out by members of the organization to facilitate its operations.

Certain of the defendants have moved the Court to dismiss the charges against them under the double jeopardy clause of the fifth amendment to the U.S. Constitution, to block the government from introducing specific evidence to the jury under the principle of collateral estoppel, to sever the defendants into separate trials, to dismiss certain counts of the indictment as being duplicitous or multiplicitous, and to suppress physical evidence seized by government agents from the homes of the defendants.[2] Rather than burden the record with an overview of the alleged facts uncovered by the government investigation, the Court will discuss specific facts in regard to the motions made by each particular defendant. First, however, a brief summary of the charges in the pending indictment is in order.

The first count of the sixth superseding indictment charges that all defendants participated in a fourteen-year conspiracy to import heroin and cocaine into the United States in violation of Sections 802, 812, 951, 952, 960(a)(1), 960(b)(1)(A) and (B), and 963 of Title 21, and Section 2 of Title 18, of the U.S. Code. This conspiracy existed and functioned from January 1, 1975, to the date of the filing of the indictment. The Grand Jury charges that responsibilities in the importation conspiracy—such as investment, international smuggling, domestic reception, storage, and primary and secondary wholesale distribution of the narcotics—were divided between defendants. Count one lists 172 alleged overt acts which refer to specific narcotics transactions, meetings and communications between defendants and other co-conspirators.

Count two of the indictment incorporates the overt acts and alleged methods employed by the conspiracy as set out in count one, and charges all defendants with a conspiracy to distribute or to possess with intent to distribute heroin and cocaine in violation of Sections 802, 812, 841(a)(1) and

---

1. The first indictment was filed by the Grand Jury on December 14, 1988. Of the defendants charged in the sixth superseding indictment, Rosario Naimo, Paolo D'Amico and John Doe, a/k/a "Sasha," are fugitives.

2. All the defendants before the Court filed motions asking for one or more types of relief, except for Salvatore D'Amico who filed no motions.

(b)(1)(A), and 846 of Title 21, and Section 2 of Title 18, of the U.S.Code.

Count three of the pending indictment charges defendant Giuseppe Gambino with the organization and supervision of a continuing criminal enterprise in violation of 21 U.S.C. § 848(a) and (b). The indictment alleges numerous substantive violations of the narcotics laws and incorporates the violations set out in counts one and two. Defendant Gambino allegedly supervised this continuing criminal enterprise from January 1, 1975 to the date of the indictment. In count four of the indictment, defendant Rosario Naimo is charged under Section 848 in a similar fashion. Defendant Naimo is a fugitive at this time.

Count five of the indictment charges defendants Gambino, Naimo, LoBuglio, and Salvatore D'Amico with a single substantive distribution of over 100 grams of heroin on March 15, 1988. Count six charges defendants Gambino and Mannino with obstruction of justice in violation of Sections 1512 and 2 of Title 18. During the period from December 1, 1988 up through the filing of the indictment, defendants Gambino and Mannino allegedly took action to intimidate and interfere with the testimony of a government informant, Giovanni Zarbano.

Count seven of the indictment charges all defendants with participating in a criminal enterprise in violation of the RICO statute, 18 U.S.C. §§ 1961–62. This enterprise allegedly existed from January 1, 1970 up to the date of the indictment. The Grand Jury charges that defendants engaged in a pattern of racketeering activity consisting of forty-two predicate acts. These acts describe alleged narcotics transactions, bribery of public officials, violations of the Travel Act, extortion, gambling, murder, and obstruction of justice.

This order and opinion is divided into three parts. First, the Court will consider the unique and complex motions of defendants Gambino, Romano, and Adamita based on the double jeopardy clause of the fifth amendment to the U.S. Constitution and the principle of collateral estoppel. Second, the Court will turn to the severance motions brought by certain of the defendants, and will discuss how the group of defendants should be divided up for trial purposes. Third, the Court will consider several motions brought by individual defendants—defendant LoBuglio's motion to suppress physical evidence, and LoBuglio's and defendant LaRosa's motions to dismiss the first two counts of the indictment as being duplicitous and multiplicitous.

## I. DOUBLE JEOPARDY AND COLLATERAL ESTOPPEL

The double jeopardy clause of the fifth amendment to the U.S. Constitution provides that "[n]o person ... shall be subject for the same offence to be twice put in jeopardy of life or limb." Courts should grant a motion for double jeopardy and thus bar the subsequent prosecution when the offenses charged appear in fact and law the same. *United States v. Nersesian,* 824 F.2d 1294, 1319 (2d Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987).

The Second Circuit has held that a court must examine the totality of the circumstances in ruling on a double jeopardy motion regarding successive conspiracy prosecutions. The following factors should be considered:

(1) the criminal offenses charged in successive indictments; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and (8) the degree of interdependence between alleged distinct conspiracies.

*United States v. Reiter,* 848 F.2d 336, 340 (2d Cir.1988); *United States v. Korfant,* 771 F.2d 660, 662 (2d Cir.1985) (per curiam).[3] The Second Circuit has applied similar factors in determining whether succes-

---

**3.** These factors are known as, and will be referred to in this opinion, as the *"Korfant* factors."

sive RICO prosecutions violate the double jeopardy clause. *United States v. Russotti*, 717 F.2d 27, 33 (2d Cir.), *cert. denied sub nom. Manino v. United States*, 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984).

The nature of the crime of conspiracy complicates the double jeopardy inquiry. Whether the object of the conspiracy is to commit one or many crimes, it is the unlawful agreement between co-conspirators that the federal statutes punish. *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942). A court must keep in mind that the same conspiracy may be established by different aggregations of proof. *United States v. Mallah*, 503 F.2d 971, 985 (2d Cir.1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). While overt acts may be the most concrete clues in an indictment as to the nature of the underlying conspiracy, too much reliance on overt acts may confuse the proper aims of the judicial inquiry. *See id.* (*citing Short v. United States*, 91 F.2d 614, 624 (4th Cir.1937)). The government should not be permitted to divide overt acts stemming from the same conspiracy into different conspiracy prosecutions. *See United States v. Papa*, 533 F.2d 815, 820 (2d Cir.), *cert. denied*, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976).

The moving defendant bears the burden of proof that a subsequent government prosecution violates the double jeopardy clause. However, the burden may switch to the government to prove distinct conspiracies if the defendant makes a sufficient showing of overlap.

> Where the Government alleges that defendants conspired with others, and there is evidence that participants of one conspiracy are acquainted with personnel in the other, that the conspiracy cannot operate without a larger organization backing it up, and that dates and geographic areas overlap, the burden of proving separate conspiracies shifts to the prosecution.

*Reiter, supra,* 848 F.2d at 341; *United States v. Abbamonte*, 759 F.2d 1065, 1069 (2d Cir.1985). In short, if a movant makes a sufficient showing under the *Korfant* factors, then the burden of proof switches to the government.

### 1. Defendant Gambino's Motions

Giuseppe Gambino argues that counts one, two, and three of the indictment should be dismissed under the double jeopardy clause. Those counts allege, respectively, that Gambino conspired from January 1, 1975 to December 14, 1988 to import and distribute narcotics, and that he engaged in and supervised a continuing criminal enterprise. In 1981, Gambino was acquitted by a jury in the Eastern District of New York on charges that he had conspired from August 1, 1979 to March 18, 1980 to import heroin into the United States. *United States v. Gambino*, 80 Cr. 131 (E.D.N.Y.) (Neaher, J.).[4] Gambino was charged with violating 21 U.S.C. §§ 952(a) and 960(a)(1) and was acquitted after several days of trial.

Gambino relies on a combination of double jeopardy and collateral estoppel arguments in urging dismissal of the first three counts of the 1989 indictment. First, he argues that count one should be dismissed on "traditional" double jeopardy grounds, as it charges certain overt acts which were central to the 1981 trial and therefore alleges the same conspiracy. Second, he claims that the principle of collateral estoppel bars prosecution on count two. Third, Gambino argues that the third count of the 1989 indictment should be dismissed under the double jeopardy clause, because conspiracy to import heroin is a lesser included offense of a continuing criminal enterprise. Each of these will be considered in turn.

### A. Gambino's Motions as to Count One

#### i. Double Jeopardy

With regard to count one, Gambino argues that "[r]arely has there ever been a

---

4. The Eastern District trial will be referred to as the "1981 trial." The indictment in that case will be referred to as the "1980 indictment." The indictment in the case at bar will be referred to as the "1989 indictment."

case where a double jeopardy claim on a conspiracy charge is so plain." Gambino's Memorandum of Law at 10. The fact that the 1989 indictment alleges certain overt acts which were central to the government's failed proof in the 1981 trial, Gambino claims, is indisputable proof that both indictments allege the same conspiracy.[5] In his reply memorandum of law, Gambino argues that the multi-factor test of *Reiter* and *Korfant* is irrelevant, because the conspiracies are the same on the faces of the indictments.

The Court does not accept Gambino's contentions in this regard and will apply the *Korfant* factors in its analysis of Gambino's motion. To start, one of the *Korfant* factors, and therefore one of the concerns the Court must weigh, is the existence of common overt acts. *Reiter, supra,* 848 F.2d at 340; *Korfant, supra,* 771 F.2d at 662. This factor is but one of eight which the Court must consider, and is not dispositive of the entire motion. Accepting Gambino's legal position would create a large and irrational loophole in the multifactor test.[6]

█ Application of the *Korfant* factors to Gambino's double jeopardy motion on count one of the 1989 indictment shows insufficient similarity between the two alleged conspiracies to dismiss that count. Several of the factors do show a close relationship between the two prosecutions: both charge the importation of heroin into the United States under 21 U.S.C. §§ 952 and 960(a)(1); both involve Emanuele Adamita, as a co-conspirator in the 1981 trial and as a co-defendant in the 1989 indictment; the timeframe of the 1980 indictment is contained within the timeframe of 1989 indictment; the modes of operations

alleged are similar; some overt acts charged in the 1989 indictment were part of the evidence at the 1981 trial; the geographic areas alleged in the 1980 indictment are contained within those alleged in the 1989 indictment; and there were common objectives, to wit, the importation of narcotics for financial profit. Given such a showing by Gambino, the burden has indeed shifted to the government to show distinct conspiracies. *See Reiter, supra,* 848 F.2d at 341. But the Court finds that the government has sustained this burden.

Count one of the 1989 indictment charges a fourteen-year conspiracy to import both heroin and cocaine, while the 1981 prosecution alleged an eight-month conspiracy to import heroin only. The 1989 indictment lists 172 overt acts in furtherance of the conspiracy, 39 of which mention Giuseppe Gambino by name. Of those 39 acts, only 2 concern events covered in the 1981 trial. Many of the 39 acts set out in the 1989 indictment allege conversations and meetings among co-conspirators the contents and evidentiary value of which the Court is unaware. But there are also detailed allegations of narcotics transactions having no relation to the 1981 trial, including a scheme to transfer cocaine from Florida to New York undertaken after Gambino's 1981 acquittal.[7] Of the 15 co-defendants and 27 co-conspirators in the 1989 indictment, only three, one of whom was Gambino and another a government informant, were involved in the 1981 trial.

A comparison of this case with the facts of *United States v. Reiter* demonstrates that Gambino's double jeopardy motion with respect to count one should not succeed. In *Reiter,* the defendant was indict-

---

**5.** The 1980 indictment charged no overt acts.

**6.** The legal position put forward by Gambino's counsel would create new law. Whenever a subsequent conspiracy indictment charged overt acts which had either been charged in a previous indictment or had been part of the evidence in a previous conspiracy prosecution, then the entire subsequent conspiracy indictment would have to be dismissed. The Second Circuit has implicitly rejected this approach by considering the totality of the circumstances through the multi-factor test of *Reiter* and *Korfant.*

**7.** The existence of common overt acts which are "crucial parts of the proof of conspiracy" tends to cut across the multi-factor test and suggest a single conspiracy. *United States v. Marable,* 578 F.2d 151, 154 (5th Cir.1978). The allegations of conspiracy to import in the 1981 trial are important and substantive parts of the government's proposed proof under the 1989 indictment, yet they are not so crucial as to outweigh the other factors militating for denial of Gambino's claim.

ed three times on conspiracy charges, referred to by the Second Circuit as Reiter I, Reiter II, and Reiter III. *See generally United States v. Reiter, supra,* 848 F.2d at 337–40. The most closely related conspiracies, eventually determined by the Second Circuit as being distinct for double jeopardy purposes, were Reiter II and Reiter III. *Id.* at 341. In both Reiter II and Reiter III, the defendant was charged with conspiring to distribute and to possess with intent to distribute narcotics, as well as with other statutory offenses. Of the sixteen defendants charged in Reiter II and seven in Reiter III, two individuals are named in both indictments. Reiter II was a four-month conspiracy contained within the timeframe of Reiter III which was a seven-year conspiracy. Though the geographic areas where the alleged events took place overlap, there was no duplication of overt acts, and, in fact, all the overt acts in Reiter III took place after the timeframe of Reiter II had ended. The Second Circuit found that the defendant Reiter had made a sufficient showing of similarity so that the burden switched to the government, but that the government had carried this burden and proven separate and distinct conspiracies. *Reiter, supra,* 848 F.2d at 341–42.

Despite the insertion of certain overt acts in Gambino's 1989 indictment which were central to the 1981 trial, the Court believes that the situation at bar presents two conspiracies more distinct than Reiter II and Reiter III. In brief, the magnitude of the conspiracy alleged in the 1989 indictment overwhelms the scale of the conspiracy alleged in the 1980 indictment. The differences between Reiter II and Reiter III are less drastic. It would be a gross extension of double jeopardy protection to dismiss all of count one of the 1989 indictment, which charges fifteen defendants with a fourteen-year conspiracy to import narcotics, based on Gambino's 1981 acquittal.

*ii. Collateral Estoppel*

■ Defendant Gambino argues that if the Court decides to deny his motion to dismiss count one of the indictment on dou-

ble jeopardy grounds, which the Court has done, then the Court should prevent the government from introducing any evidence of Gambino's alleged involvement in the 1980 heroin importation scheme under the principle of collateral estoppel. With regard to collateral estoppel, Judge Friendly has written:

> Application of the principle inevitably has two phases. The first is to determine what the first judgment determined, a process in which ... the court must look not simply to the pleadings but to the record in the prior trial. The second is to examine how that determination bears on the second case.

*United States v. Jackson,* 778 F.2d 933, 938–39 (2d Cir.), *cert. denied,* 479 U.S. 910, 107 S.Ct. 308, 93 L.Ed.2d 282 (1986); *United States v. Kramer,* 289 F.2d 909, 913 (2d Cir.1961). A defendant asserting collateral estoppel bears the burden of establishing what factual issues the jury necessarily resolved during the first trial. *United States v. Medina,* 709 F.2d 155, 156 n. ** (2d Cir.1983). "This burden is particularly onerous where the acquittal in the first trial involves the crime of conspiracy." *United States v. Clark,* 613 F.2d 391, 400 (2d Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *United States v. Nenadich,* 689 F.Supp. 285, 292 (S.D.N.Y.1988).

The Court is sensitive to the language of the U.S. Supreme Court which has stated that

> [t]he federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality.

*Ashe v. Swenson,* 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970); *see also United States v. Citron,* 853 F.2d 1055, 1058 (2d Cir.1988) (stating that a court should not make the defendant's burden overly difficult by postulating "hypertechnical and unrealistic" grounds on which the jury could have rested). In a close case, a court may weigh the equities of allowing a subsequent prosecution. *See*

*United States v. Mespoulede,* 597 F.2d 329, 335 (2d Cir.1979). "For whatever else that constitutional guarantee [against double jeopardy] may embrace ..., it surely protects a man who has been acquitted from having to 'run the gauntlet' a second time." *Ashe v. Swenson, supra,* 397 U.S. at 445–46, 90 S.Ct. at 1195.

The bulk of the prosecution's evidence in Gambino's 1981 trial consisted of the direct testimony of Frank Rolli, a government informant who allegedly conspired with Giuseppe Gambino and Emanuele Adamita to import heroin from Italy into the United States. Rolli testified that he met twice with Gambino and Adamita in Brooklyn during March, 1980, and that the three men discussed a plan to smuggle approximately ten kilograms of heroin through customs at Kennedy Airport. (Transcript of 1981 Eastern District trial ("1981 trial Tr.") at 103–13, 126–31). Rolli testified that Gambino agreed to pay him $30,000 for his assistance (1981 trial Tr. at 112). Rolli and Adamita then travelled to Italy at which time Rolli became aware that the quantity of heroin to be imported had risen to nearly forty kilograms. According to Rolli, Gambino had said at one of their Brooklyn meetings that he would be in contact with "his friends" regarding the final amount to be imported (1981 trial Tr. at 403–04). At oral argument, counsel for defendant Gambino suggested that Gambino was thus aware of the change in the size of the shipment (Transcript of oral argument before the Court, Dec. 28, 1989 ("Oral Argument Tr.") at 47–48). The heroin was seized at Kennedy Airport and Gambino was subsequently arrested, tried, and acquitted.

In their briefs and at oral argument, counsel for the government and for defendant Gambino presented markedly different interpretations of the jury's acquittal.

The government claims that the jury's verdict was based on the lack of proof that Gambino knowingly and intentionally joined the 40 kilogram importation conspiracy which was charged in the 1980 indictment. The government focuses on the fact that Rolli's meetings with Gambino both occurred when the quantity of heroin was expected to be 10 kilograms or less. Thus the government argues that it should not be estopped from introducing evidence that Gambino conspired to import the smaller shipment initially envisioned.

Counsel for Gambino view the jury's verdict of acquittal more broadly. They argue that the jury, viewing the evidence presented to it with regard to Gambino's involvement in the importation conspiracy, found that Gambino simply had no involvement with the plan. They urge the Court not to read between the lines of the verdict and not to find that the jury made a distinction between the 10 kilogram shipment initially discussed and the 40 kilogram shipment eventually carried out. Gambino's 1981 acquittal should be interpreted as a finding of complete non-involvement with the importation conspiracy.

The Court believes that while Gambino's argument is overstated,[8] the government should be barred from introducing proof of Gambino's alleged involvement in the 1980 importation conspiracy, as set out in overt acts 11–18 of the 1989 indictment, for the purposes of proving count one of the indictment during the upcoming trial. As Mr. Panzer, co-counsel for defendant Gambino, stated at oral argument, the verdict seemed to come down to the question of the credibility of the witnesses. (Oral Argument Tr. at 22). Though the Court will not conjecture as to whether the jury believed the testimony of defendant Gambino or the deposition of Emanuele Adamita, the testi-

---

**8.** It would be improper for the Court to rule that the 1981 verdict demonstrates Gambino's total non-participation with the alleged 1980 importation scheme. Depending on the facts required to prove the particular offense charged, the Court could permit subsequent prosecutions based on the 1980 scheme. For example, the government might be entitled to use the same testimony in order to establish another crime—

aiding and abetting—at a second trial. *See United States v. Jackson,* 778 F.2d 933, 940 (2d Cir.), *cert. denied,* 479 U.S. 910, 107 S.Ct. 308, 93 L.Ed.2d 282 (1986); *United States v. Clark,* 613 F.2d 391, 402 (2d Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980) (conspiracy acquittal does not bar subsequent prosecution for substantive offense).

mony of informant Frank Rolli was successfully attacked by Gambino's 1981 trial counsel.

Most all of the government's case in the 1981 trial rested on the testimony of Rolli who met with Gambino and Emanuele Adamita twice in Brooklyn allegedly to arrange for the heroin shipment. In viewing the transcript of Rolli's testimony, the Court believes that credibility problems overshadowed the substance of the testimony. First, Rolli testified on cross examination that everything Gambino had said during both Brooklyn meetings added up to no more than 15 to 20 minutes of conversation. (1981 trial Tr. at 267–68). Second, Rolli admitted to stealing goods on more than one occasion while working for Alitalia Airlines at Kennedy Airport, and to threatening to kill his supervisor, presumably to prevent exposure. (1981 trial Tr. at 239–40, 243, 245). Rolli denied stealing specific other goods, such as leather jackets, watches, and a gold bar, and selling them from a boutique on 18th Avenue in Brooklyn. (1981 trial Tr. at 240–43). Third, Rolli admitted to burning his car, to lying under oath to an insurance company, and to collecting $9000. (1981 trial Tr. at 246–54). Fourth, Rolli testified that government investigators had attached an eavesdropping device to his person prior to both his meetings with Gambino, but that he had ripped the devices off on both occasions and had thus not preserved recordings of the incriminating conversations (1981 trial Tr. at 98, 126).

These significant weaknesses with the testimony of the government's chief witness demonstrate that the 1981 jury simply did not believe that the government had sustained its burden of proving Gambino's guilt beyond a reasonable doubt. It is certainly possible that the jury might have found Gambino guilty of conspiring to import 10 kilograms of heroin, while it felt there was insufficient evidence to convict him for conspiring to import 40 kilograms. Yet the Court believes that such a conclusion would represent precisely the "hypertechnical and archaic approach" to collateral estoppel which the Supreme Court warned against in *Ashe v. Swenson, supra,*

397 U.S. at 444, 90 S.Ct. at 1194. It is only just and fair for the Court to rule that the government should not be able to reintroduce proof of the 1980 importation scheme in its attempt to convict Gambino of conspiring to import narcotics under the 1989 indictment.

### B. Gambino's Motions as to Count Two

#### i. Double Jeopardy

■ Gambino also moves for dismissal of count two of the 1989 indictment on double jeopardy grounds. Count two charges a fourteen-year conspiracy to distribute or to possess with intent to distribute narcotics in violation of 21 U.S.C. § 841. Count two incorporates the same 172 overt acts as set out in count one. Gambino's motion to dismiss all of count two on double jeopardy grounds must fail for the same reasons that his motion to dismiss count one has failed. In addition, the charging of a distinct statutory offense, distribution rather than importation, further distinguishes the 1989 indictment from the 1980 indictment. *See Albernaz v. United States,* 450 U.S. 333, 344 n. 3, 101 S.Ct. 1137, 1145 n. 3, 67 L.Ed.2d 275 (1981) ("It is well settled that a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause." (citations omitted)).

#### ii. Collateral Estoppel

■ Gambino also moves the Court to bar the government from introducing evidence of the 1980 importation scheme to prove the distribution conspiracy charged in count two of the 1989 indictment. To grant Gambino's motion, the Court would have to find that the 1981 jury's verdict of acquittal for conspiracy to import also by necessity meant an acquittal for conspiracy to distribute. The Court did rest its decision to bar the government from introducing evidence of the 1980 importation scheme on the fact that it believed that credibility problems with the government's chief witness, Frank Rolli, lay behind the

jury's verdict. This might lead the Court to rule that any testimony by Rolli, whether to show a conspiracy to import or to distribute, would be incredible.

The Court is hesitant, however, to apply the principle of collateral estoppel when different charges, requiring the proof of different facts, are alleged by the government. Looking behind the rationale of the 1981 jury's verdict is one matter; deciding how the 1981 jury would have come out on a distinct factual issue is another. Thus the Court will allow the government to introduce evidence of the 1980 scheme to prove count two of the 1989 indictment.[9]

### C. Gambino's Motions as to Count Three

#### i. Double Jeopardy

Defendant Gambino moves the Court to dismiss count three of the 1989 indictment against him on double jeopardy grounds. Count three charges that Gambino was engaged in and supervised a continuing criminal enterprise in violation of 21 U.S.C. § 848. Gambino argues that since the Court should dismiss the first two counts of the indictment on double jeopardy grounds—those alleging conspiracies to import and distribute narcotics—count three must be dismissed as well. As the Court did not decide to dismiss either of the first two counts on double jeopardy grounds, Gambino's motion to dismiss the third count on those grounds must fail.

#### ii. Insufficient Quantity of Narcotics

▮ Gambino argues that if the Court rules to bar the government from introducing proof of the 1980 importation scheme at trial, then the government has not fulfilled the minimum-quantity requirements of 21 U.S.C. § 848. Under 21 U.S.C. § 848(b)(2)(A), the government must prove that the defendant engaged in a continuing criminal enterprise involving at least 30 kilograms of heroin or 150 kilograms of cocaine if it wishes to seek life imprisonment or heavy fines under § 848(a). *See* 21 U.S.C. §§ 848(b)(2)(A), 841(b)(1)(B). According to Gambino, if the government is collaterally estopped from introducing evidence of the 1980 importation scheme, then this minimum-quantity requirement cannot be met.

It is, however, up to the jury to decide whether the government has proven beyond a reasonable doubt that a defendant has engaged in a continuing criminal enterprise involving 30 kilograms of heroin or 150 kilograms of cocaine. If the jury convicts Gambino of involvement with less than the minimum amounts, then the time would be ripe for a sufficiency argument by the defendant. *See* Government's Memorandum of Law at 52 n. *. The government has alleged in the indictment numerous narcotics transactions, the details of which will be presented to and weighed by the jury. Thus Gambino's motion to dismiss count three of the indictment must fail.

### 2. Defendant Romano's Motions

#### A. Double Jeopardy Motions as to Counts One and Two

On March 31, 1988, Matteo Romano and 27 others were charged with conspiracy to import and distribute narcotics. SS 88 Cr. 217 (JES) (hereinafter "Romano I").[10] The indictment charged a three-year conspiracy, commencing on January 1, 1985 and ending on June 30, 1988, and cited 105 overt acts occurring in New York City and other locations in the Eastern United States. Romano was eventually tried with thirteen co-defendants in the Southern District of New York and acquitted in early 1989. Romano now argues that his acquittal in Romano I

---

**9.** The parties are forewarned that the Court will have to consider the admissability of evidence of the 1980 scheme to prove count two of the indictment under Fed.R.Ev. 403 due to the potential undue prejudicial effects to defendant Gambino. The Court will also have to consider a limiting instruction to the jury, including explanation of the facts concerning Gambino's 1981 acquittal, to be certain that the jury will be able to compartmentalize the evidence and apply it only towards the counts of the indictment for which it was admitted to prove.

**10.** The trial was officially called *United States v. Adamita.*

precludes his prosecution under the pending indictment on double jeopardy grounds.

Both Romano and the government admit to the relevance of the *Korfant* factors in determining whether the offenses charged in Romano I and the current indictment are in fact and law the same. The parties put forward, however, markedly different characterizations of the two prosecutions against defendant Romano. The Court will undertake a detailed examination of the indictment and trial in Romano I as compared with counts one and two of the pending indictment in light of the *Korfant* factors.

The statutory offenses charged in the Romano I indictment and the first two counts of the 1989 indictment are very similar. While the importation and distribution of narcotics are alleged in a single count in the Romano I indictment, they are split into separate counts in the 1989 indictment. The only substantial difference is that the Romano I indictment charged a conspiracy to export controlled substances under 21 U.S.C. § 953. Also, in addition to charging violations involving heroin and cocaine, the Romano I indictment charges the defendants with the distribution of marijuana. On the whole, however, the Court views the offenses charged in the two indictments as essentially similar.

There is an overlap in the alleged participants in the two indictments. The Romano I trial charged 14 defendants and referenced 67 co-conspirators, while the 1989 indictment charged 14 defendants and referenced 27 co-conspirators. Out of these participants, there are three common defendants and 18 common co-conspirators. This overlap in personnel demonstrates that certain of the participants in the two alleged conspiracies are indeed "acquainted." *See Reiter, supra,* 848 F.2d at 341. However, the fact that the majority of named co-defendants and co-conspirators in the two indictments do not overlap shows that the indictments charge two essentially different groups of individuals.

The defendants common to both indictments are Matteo Romano, Emanuele Adamita, and Joseph LaRosa. The Court takes note, as the government pointed out at oral argument, that the allegedly central figures of the conspiracy charged in the 1989 indictment—Giuseppe Gambino, Rosario Naimo, and Lorenzo Mannino—were not mentioned in the Romano I indictment or trial.[11] Thus while the conspirators charged in the two indictments do overlap, the leaders of the conspiracies are distinct.

In terms of modes of operation and objectives, the conspiracies are similar as well. Both employed human couriers to smuggle narcotics from Europe into the United States, though at times the conspiracy alleged in the pending indictment sent narcotics concealed in commercial packages. When the narcotics arrived in the United States, it was part of both conspiracies that they would be transferred to secondary wholesale distributors, who at often times would dispense them using legitimate

11. Counsel for defendant Romano point to a picture of Matteo Romano, Emanuele Adamita, and Giuseppe Gambino which was admitted into evidence at the Romano I trial as showing that Gambino was involved in the conspiracy charged in the Romano I indictment. The government argues in response that Gambino was never identified for the jury, and that for double jeopardy purposes the picture of Gambino is irrelevant. The question arises, at this time and at others, what should be central to the Court's inquiry—what was received into evidence for the jury to consider, or what actual similarities existed between the conspiracies. On the one hand, the Second Circuit has shown great concern over the ability of the government to divide the same conspiracy into separate chunks of proof in order to dilute the risk of an adverse jury verdict. *See United States v. Papa,* *supra,* 533 F.2d at 820; *United States v. Mallah,* *supra,* 503 F.2d at 985. On the other hand, defense counsel should not be given complete license to introduce evidence of the similarity between the conspiracies that was not touched on in either the prior indictment or at trial. It is, after all, the conspiracy for which the defendant was previously tried which is relevant to the double jeopardy inquiry. The Court will consider, however, arguments by counsel as to the similarity between the conspiracies, even if such evidence was not admitted into evidence and shown to the jury. But in this instance, the Court does not consider that a single photograph of Gambino, Romano, and Adamita standing in front of Concord Furniture, Romano's furniture store, carries much weight in showing that the two conspiracies at issue are similar for double jeopardy purposes.

businesses as fronts. In the Romano I trial, these businesses were usually pizza parlors and in one instance a clothing store. In the 1989 indictment, the government charges the use of a furniture store, a Brooklyn cafe, and construction sites for the storage and distribution of narcotics. To facilitate the narcotics trade, both conspiracies employed pay telephones, codes, threats, and acts of violence. The objectives of both conspiracies were to sell narcotics to enrich their members.

The parties dispute the degree to which the two alleged conspiracies overlap in time. On the faces of the indictments, Romano I charged a conspiracy to import and distribute narcotics stretching from January 1, 1985 to June 30, 1988, while the conspiracy charged in the 1989 indictment allegedly existed from January 1, 1975 up to the filing of the indictment on December 14, 1988. Counsel for defendant Romano argue, however, that the identity of the timeframe is greater than the three and one-half years evident from the faces of the indictments, as the government in Romano I actually introduced evidence in that case stretching back to the mid–1970s. Counsel claim that "nearly every overt act charged in the [1989] indictment before January 1, 1985 was part of the evidence at the Romano I trial." (Defendant Romano's memorandum of law at 16).

The government vigorously contests this attempted expansion of the scope of the Romano I conspiracy. The government claims that evidence of narcotics dealing before 1985 was admitted in Romano I solely for purposes of impeachment, and that Judge Sprizzo specifically instructed the jury not to rely on any evidence of pre–1985 dealing in deciding whether the conspiracy charged in the indictment existed. In reply, counsel for Romano argue that regardless of whether the evidence was admitted to the jury for probative purposes, it still goes to the central question before the Court—are the two conspiracies charged one and the same?

As stated in footnote 11 above, though the Court will consider all information put forward by defendant Romano which demonstrates the similarity between the conspiracies, the Court will focus its inquiry on the evidence received at trial in Romano I and the conspiracy which the government actually tried to prove in that case to support the charges in the Romano I indictment. The Court therefore does not give great weight to the evidence of drug transactions prior to 1985. Furthermore, those transactions as brought out during the testimony of Filippo Ricupa do not necessarily demonstrate the existence of the same conspiracy stretching back to the mid–1970s. Thus the Court agrees with the government that the overlap in time between Romano I and the 1989 indictment is three and one-half years only.[12]

A comparison of the geographic scopes of the two alleged conspiracies shows some similarity but also some significant differences. The majority of conspiratorial acts in both indictments occurred in the vicinity of 18th Avenue in Brooklyn. In addition, acts are alleged to have taken place in Italy and along the U.S. Eastern seaboard in Washington, D.C. and Philadelphia. The 1989 indictment alone refers to activities in Florida, involving cocaine transactions and the escape of Emanuele Adamita from immigration detention. These more recent alleged criminal activities in Florida suggest a dimension of the conspiracies alleged in the 1989 indictment wholly lacking in the Romano I indictment.

Romano argues that six overt acts are repeated word for word in both indictments, and that 26 of the acts alleged in the 1989 indictment were explicitly part of the evidence at the first trial. The government admits to three principal areas of

---

12. The government points to statements made by Judge Sprizzo and Mr. Shargel, counsel for defendant Romano both during Romano I and in the case at bar, which might indicate that the transactions testified to by Ricupa and the conspiracy alleged in the Romano I indictment were unrelated. It is more likely that those comments simply referred to the fact that evidence of pre–1985 transactions was not admissible to prove the conspiracy alleged in the indictment, rather than a decision by the judge, or an admission by Mr. Shargel, that the conspiracy could never be shown to exist before 1985 for double jeopardy purposes.

overlap between the overt acts alleged in the 1989 indictment and the proof introduced during the Romano I trial. First, overt acts 24–32 of the 1989 indictment allege an importation scheme using couriers and smuggled packages of heroin which operated from February, 1985 through March, 1986. The scheme was run by at least three individuals who were co-conspirators in both cases. Second, overt acts 48–56 and 58–63 of the 1989 indictment charge Emanuele Adamita, a defendant in both cases, with narcotics transactions. Some of the overt acts are repeated word for word in both indictments. Third, overt acts 54 and 55 of the 1989 indictment allege that two defendants in Romano I, who are named co-conspirators in the 1989 indictment, discussed and executed the delivery of a kilogram of cocaine to Concord Furniture, Matteo Romano's furniture store on 18th Avenue in Brooklyn.

This significant overlap of factual events draws the Court's attention to the close relationship between the two alleged conspiracies. However, a close examination of the 1989 indictment shows that the great bulk of the acts alleged by the government, and the evidence it intends to introduce at trial, have not yet been brought before a jury. Some of the most significant chunks of alleged conspiratorial activity not part of Romano I are all of the pre–1985 narcotics transactions, the commencement of cocaine transactions involving Florida sources (overt acts 35–40), the escape of Emanuele Adamita from immigration detention in Florida (overt acts 41–47), Romano's narcotics transactions involving co-conspirator Paolo Rizzuto in December 1987 and January 1988 (overt acts 64–68), and the extensive use of the Caffe Giardino for narcotics transactions after the final Romano I indictment had been handed down (overt acts 86–172). Both the large absolute number of alleged conspiratorial activities not considered in Romano I, and that number relative to the activities which were considered in Romano I, suggest to the Court that the two conspiracies are different for double jeopardy purposes.

The Court believes that this case presents a slightly closer case than the comparison between the Reiter II and Reiter III conspiracies in *United States v. Reiter, supra,* 848 F.2d 336, discussed in detail above with regard to defendant Gambino's double jeopardy motion. There is undoubtedly a connection between the two conspiracies. Yet current caselaw, most specifically the totality of the circumstances approach set out in *Korfant* and *Reiter,* allows the government to proceed with a subsequent conspiracy prosecution even when there is some overlap with a prior trial. Given the large scale of organized crime at this time, it would be impractical for our concept of "one conspiracy" to be so broad as to block subsequent prosecutions when any connection between conspiracies can be shown by the defense. Therefore, defendant Romano's motion to dismiss the first two counts of the indictment against him on double jeopardy grounds is denied.

### B. Double Jeopardy Motion as to Count Seven

Count seven of the indictment charges a RICO conspiracy under 18 U.S.C. § 1962. The count alleges that the defendants acted together as an enterprise as defined in 18 U.S.C. § 1961(4) and committed 42 predicate acts of racketeering. Defendant Romano is mentioned in 9 of the 42 alleged predicate acts. He argues that these 9 acts "almost exclusively involve conduct previously at issue in the 21 U.S.C. 846 conspiracy prosecuted in *United States v. Adamita, et al.* (Romano I)." (Defendant Romano's memorandum of law at 34). Romano claims that under the double jeopardy clause, these acts cannot be used as predicate offenses against him in a subsequent RICO prosecution. The government contests Romano's characterization of count seven of the indictment, arguing that the predicate acts allege significant criminal activity by Romano not considered in Romano I.

Though the Second Circuit has not yet reached the issue, several other circuits have held that the RICO statute creates a separate offense for double jeopardy pur-

poses. *See United States v. Hartley,* 678 F.2d 961, 992 (11th Cir.), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983); *United States v. Aleman,* 609 F.2d 298, 306 (7th Cir.), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Rone,* 598 F.2d 564, 571 (9th Cir.1979). The Second Circuit has held, however, that cumulative sentencing under 21 U.S.C. § 846 and the RICO statute is not violative of double jeopardy. *United States v. Thomas,* 757 F.2d 1359 (2d Cir.), *cert. denied, sub nom. Fisher v. United States,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985) (*citing Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). Judge Newman's dissent in *Thomas,* on the other hand, opposed the imposition of cumulative sentencing on the grounds that a violation of § 846 could under certain circumstances be viewed as a lesser included offense of a § 1962 RICO conspiracy. *Thomas, supra,* 757 F.2d at 1373. Romano argues that when the factual basis for the § 846 and § 1962 violations are similar, a court should consider the § 846 violation as a lesser included offense of the § 1962 charge, and thus bar a subsequent § 1962 prosecution on double jeopardy grounds.

In *United States v. Persico,* 774 F.2d 30, 32 (2d Cir.1985), the Second Circuit held that prior substantive acts for which the defendants had been convicted could serve as predicate acts in a subsequent RICO indictment. In *Persico,* however, other of the alleged predicate acts had taken place after the defendants had entered guilty pleas in the prior lawsuit. The Second Circuit specifically refused to state that continued post-plea involvement in a criminal enterprise was necessary to avoid a double jeopardy bar to a subsequent RICO prosecution.[13] In a subsequent proceeding, the Second Circuit again refused to create such a requirement. *United States v. Persico,* 832 F.2d 705, 711 (2d Cir.), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988).[14]

In the case at bar, however, the Court finds upon its own examination of count seven of the indictment, significant criminal activity allegedly carried out by Romano was not considered in Romano I. Thus the Court need not decide whether substantive narcotics charges and RICO charges will always be distinct for double jeopardy purposes. The predicate acts in count seven charge criminal activity by Romano both before and after the scope of the conspiracy alleged in Romano I. For example, predicate act five relates to a 1982 heroin distribution by Romano to Filippo Ragusa; predicate act seventeen charges a 1987 heroin distribution by Romano to Candela; predicate act thirty-three charges Romano's involvement with a bribery scheme by which Emanuele Adamita escaped from immigration detention in Florida; and predicate acts thirty-four and thirty-six charge Romano with extortion and threats of murder. Thus five of the nine predicate acts allege activities not considered before in a judicial proceeding against Romano. In addition, predicate acts one and two allege the fourteen-year importation and distribution conspiracies which the Court has found do not violate the double jeopardy clause. Therefore, only two of the nine predicate acts which mention Romano have been considered in judicial proceedings before, one during Romano I and one for which Romano was tried and convicted in a 1982 trial in the Eastern District of New York. Given these factual circumstances, the Court finds that prosecution of Romano under

**13.** The District Court had stated that "there could be serious double jeopardy problems" if no post-plea or post-conviction predicate acts were charged in the indictment. *United States v. Persico,* 620 F.Supp. 836, 843 (S.D.N.Y.1985) (Keenan, J.).

**14.** *See also Garrett v. United States,* 471 U.S. 773, 791–95, 105 S.Ct. 2407, 2417–20, 85 L.Ed.2d 764 (1985) (in a case where the defendant was first convicted for a substantive narcotics law violation and then prosecuted for engaging in a continuing criminal enterprise under 21 U.S.C. § 848 using the prior conviction as a predicate act, the Court did not reach the issue of whether continued post-conviction violation of § 848 is necessary to avoid a double jeopardy bar). In concurrence, Justice O'Connor stated: "Certainly the defendant's interest in finality would be more compelling where there is no indication of continuing wrongdoing after the first prosecution." *Id.* at 799, 105 S.Ct. at 2422.

count seven of the pending indictment does not violate the double jeopardy clause.

### 3. Defendant Adamita's Motions

Defendant Emanuele Adamita moves the Court to dismiss the indictment against him under the double jeopardy clause, and to sever him from the other defendants for trial. The Court will consider the double jeopardy motions in this section and the severance motion in the section *infra*. Adamita argues that his indictment with Giuseppe Gambino in 1980 in the Eastern District of New York, his conviction for narcotics dealing in 1980 in Italy, and his indictment in 1985 in *United States v. Adamita, et al.*, SS 88 Cr. 217 (JES), create a double jeopardy bar to his prosecution under the 1989 indictment.

At the outset, the Court notes that double jeopardy protection only attaches when there has been a final conviction or acquittal in the first prosecution. *Richardson v. United States*, 468 U.S. 317, 325, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242 (1984) ("[T]he protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as acquittal, which terminates the original jeopardy." (citations omitted)). Thus the Court does not consider that Adamita's motions based on his mere indictments in the Eastern District in 1980 and the Southern District in 1985 create any double jeopardy obstacles to prosecution under the pending indictment. Adamita was never tried with Gambino under the 1980 indictment, because he was a fugitive. Adamita pled guilty to four counts of the 1985 Southern District indictment and then withdrew his guilty pleas to three of the counts. The fourth count, for which Adamita was sentenced, is not detailed by counsel for defendant Adamita, and the Court assumes that it has no bearing on Adamita's double jeopardy motions. Thus the Court will consider in detail only the double jeopardy effects of Adamita's 1980 conviction in Italy.

The narcotics transaction for which Adamita was convicted and incarcerated in Italy is identical to that which is set out in overt acts 11–18 in the 1989 indictment. This is the same heroin importation plot for which Adamita was indicted in 1980 in the Eastern District of New York, and for which Giuseppe Gambino was tried and acquitted in 1981. Adamita argues that his conviction in Italy should block his prosecution under the 1989 indictment.

Adamita argues that 18 U.S.C. § 4111 provides him with double jeopardy protection as if he had been tried previously in a United States federal court.[15] This statute has been interpreted as affording the same protection to criminal defendants as the double jeopardy clause of the fifth amendment. *United States v. Fontanez*, 869 F.2d 180, 183 (2d Cir.1989); *United States v. Patterson*, 812 F.2d 1188, 1191 (9th Cir.), *cert. denied*, 485 U.S. 922, 108 S.Ct. 1093, 99 L.Ed.2d 255 (1985). However, the protection of § 4111 can only be invoked when a defendant has been transferred to the United States pursuant to a prisoner exchange treaty. 18 U.S.C. § 4100(a). Adamita makes no suggestion that he was transferred to the United States under any such treaty. In fact, the government alleges that he escaped to the United States when on leave from prison in Italy.

■ The government argues that Adamita's subsequent criminal prosecution in the United States should be permissible under the dual sovereignty doctrine, and that no double jeopardy protection from the Italian conviction should attach. Under the dual sovereignty doctrine, whenever a defendant, in a single act, violates the "peace and dignity" of two separate sovereigns by breaking the laws of each, he commits two distinct offenses. *See Heath v. Alabama*, 474 U.S. 82, 88, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985); *Abbate v. United States*, 359 U.S. 187, 193–94, 79 S.Ct. 666, 669–70, 3 L.Ed.2d 729 (1959). The Court is

---

**15.** Section 4111 provides in part that:

An offender transferred to the United States shall not be detained, prosecuted, tried, or sentenced by the United States, or any State thereof for any offense the prosecution of which would have been barred if the sentence upon which the transfer was based had been by a court of the jurisdiction seeking to prosecute the transferred offender, ...

aware of no case, however, which applies the dual sovereignty doctrine to subsequent prosecutions by different independent nations.

Whether or not Adamita is deserved of double jeopardy protection stemming from his Italian conviction, application of the doctrine to Adamita's case would mandate nearly identical conclusions as the Court reached with regard to Giuseppe Gambino above. Even assuming that the Italian trial covered the same events in overt acts 13–18, while Gambino's 1981 trial only covered the events in overt acts 13–15, the Court must rule that Adamita's prosecution under the pending indictment should not be barred under the double jeopardy clause. A detailed application of the *Korfant* factors to Adamita's motion would be similar as to Gambino's motion. The Court will not repeat the analysis here.

■ Defendant Adamita has asked to join in the motions made by his co-defendants, and thus the Court will consider the potential collateral estoppel effects of Adamita's 1980 conviction in Italy. Adamita has not explicitly argued the existence of a collateral estoppel bar to introduction of evidence of the 1980 drug transaction allegedly carried out by Adamita, Giuseppe Gambino, government informant Frank Rolli, and other named co-conspirators. The only description which counsel for Adamita gives the Court with regard to the Italian proceedings is the following:

> In Italy, in 1980, the defendant, Emanuele Adamita, was charged with the following: crimes of common association to commit crimes, association to commit crimes aimed at drug trafficing [sic], and possession of 40.610 kg. of heroin. He was convicted of all charges and incarcerated from 1980 to 1987. This same matter is contained in the case at bar in the sections entitled: "The February–March Plot to Smuggle 7 kilograms of Heroin," and "The Planned Importation is Increased to 40 kilograms."

Defendant Adamita's memorandum of law at 2. Aside from one reference equating the Italian charges to United States conspiracy and RICO law, *id.* at 4, there is absolutely no attempt to make a detailed showing as to what the 1980 Italian conviction means in collateral estoppel terms. As stated above with regard to defendant Gambino, a defendant bears the heavy burden of establishing what the first jury necessarily decided. *United States v. Clark, supra,* 613 F.2d at 400; *United States v. Nenadich, supra,* 689 F.Supp. at 292. There is no attempt made by Adamita's counsel to bear this important burden. For example, Adamita's counsel makes no effort to show the Court whether the nature of the Italian charges would block subsequent prosecution for conspiring to import or distribute, or engaging in a RICO enterprise. Thus the government is free to introduce proof of the alleged 1980 drug transaction in its case against Emanuele Adamita.

## II. SEVERANCE

All the defendants except for Giuseppe Gambino and Matteo Romano have moved the Court for severance from the main trial and thus an individual prosecution.[16] Rather than deal with defendants' severance motions on an individual basis, the Court will first lay out the general legal framework in intends to follow, and will then discuss and justify its decision as to how to try the defendants. The Court believes that this approach is proper due to the repetitiveness of many of the arguments for and against severance, and due to the macro-level case management concerns recently set out by the Second Circuit in *United States v. Casamento,* 887 F.2d 1141 (2d Cir.1989).

As an initial matter, the Court notes that motions to sever under Fed.R.Crim.P. 14 are "committed to the sound discretion of the trial judge," and that it is a defendant's "heavy burden" to:

> show facts demonstrating that he will be so severely prejudiced by a joint trial

---

**16.** Defendant Salvatore D'Amico did not file any motions. As will be discussed below, however, the Court has chosen to sever him from defendants Gambino and Romano, the only others not requesting severance.

that it would in effect deny him a fair trial. The defendant must demonstrate that he suffered such prejudice as a result of joinder, not that he might have had a better chance for acquittal at a separate trial.

*United States v. Chang An–Lo*, 851 F.2d 547, 556 (2d Cir.1988) (citations omitted). *See also United States v. Nersesian*, 824 F.2d 1294, 1303 (2d Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987) (burden of showing substantial prejudice amounting to a "miscarriage of justice"); *United States v. Bari*, 750 F.2d 1169, 1177 (2d Cir.), *cert. denied sub nom. Benfield v. United States*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir.), *cert. denied sub nom. Shipp v. United States*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir.), *cert. denied*, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984).[17]

Generally, where "defendants ... are jointly indicted [they] should be jointly tried." *United States v. Ventura*, 724 F.2d 305, 312 (2d Cir.1983). This is particularly true where the crime charged involves a common scheme or plan. *See United States v. Turoff*, 853 F.2d 1037, 1042–43 (2d Cir.1988); *United States v. Girard*, 601 F.2d 69, 72 (2d Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979). The Supreme Court has unequivocally recognized that "[j]oint trials play a vital role in the criminal justice system." *Richardson v. Marsh*, 481 U.S. 200, 209, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987).

The Second Circuit has recently given guidance to district courts in deciding severance motions in large-scale criminal trials such as the one at bar. In *United States v. Casamento*, 887 F.2d 1141, 1152 (2d Cir. 1989), the Second Circuit ruled that the burden of proof for severance motions should switch to the prosecution when certain size limitations are reached. The

Court held that when the government's case will last more than four months, the prosecutor should "present a reasoned basis to support a conclusion that a joint trial of all the defendants is more consistent with the fair administration of justice than some manageable division of the case into separate trials for groups of defendants." *Id.* When the government's case will last more than four months and is brought against more than ten defendants, then the prosecutor should make "an especially compelling justification for a joint trial...." *Id.* In making a showing for a joint trial, the court should weight the interests of the prosecution, the defendants, the jurors, the court, and the public. *Id.*

■ The current case is brought against 15 defendants, 12 of whom are before the Court, and the government has estimated that its case will take some six months to present to the jury. Under *Casamento*, the burden is clearly on the government to show "an especially compelling justification for a joint trial." The Court holds that the government has not carried the burden of justifying a joint trial of all 12 defendants. The major theme of the government's opposition to defendants' severance motions—that all defendants have worked closely together in the same narcotics conspiracy—is insufficient to warrant a single trial.

■ The Court does recognize, however, that group trials are in this instance superior to 12 separate trials. First, the government does indeed have an interest in prosecuting the case in a similar fashion as it was presented to the Grand Jury. Co-conspirators should be tried together whenever feasible. Second, the government and the public have an interest in as quick and efficient a resolution of the charges as possible. Contrary to the assertions of some defense counsel at oral argument, the Court believes that these goals are best achieved through group trials.[18] Third, stress on the witnesses will be lessened by

---

17. Though these cases set out the appellate standard for review of district court decisions, they highlight to district courts the underlying concerns of severance motions.

18. Jury selection alone in cases of this type can be prolonged and thus add greatly to the time spent on separate trials.

minimizing the total number of trials. Keeping the number of times that certain key witnesses must repeat their testimony will also reduce the relative advantage accruing to defendants who are tried at later dates and who can benefit from knowledge of the contents and weaknesses of a witness's testimony.

The Court therefore rules that the 12 defendants before the Court pursuant to the 1989 indictment will be severed into two groups for purposes of trial. One group will consist of defendants Giuseppe Gambino, Lorenzo Mannino, Francesco Inzerillo, Matteo Romano, and Emanuele Adamita ("Group A"). The other group will consist of defendants Joseph LaRosa, Salvatore LoBuglio, Giuseppe D'Amico, Salvatore D'Amico, Francesco Cipriano, Salvatore Candela, and Carmelo Guarnera ("Group B"). The Court is, of course, unable to make a division which perfectly satisfies the principal concerns of efficiency and fairness. But it believes that this division into two groups of roughly equal size best achieves those objectives.

A major concern of the Court was to divide the defendants into groups which would minimize the quantity of evidence not pertaining to a particular defendant which that defendant would have to sit through. Thus the Court grouped defendants depending on the extent of overlapping evidence based on the face of the indictment, especially the overt acts. Group A consists of individuals alleged to be leaders of the conspiracy and active from its start in the mid–1970s. They are the only defendants listed in the first 34 overt acts of the indictment, except for the fugitive Rosario Naimo. Overt acts 41–74, which concern Emanuele Adamita's escape from immigration detention in Florida, his alleged return to the narcotics trade in New York, and Matteo Romano's drug trafficking, likewise mention only Group A members, except for two references to Joseph LaRosa in overt acts 56–57. Though the interaction between Group A and Group B members increases over time, Group A represents an alleged core of conspirators operating a variety of illegal enterprises out of the Caffe Giardino. Final-ly, the alleged acts of violence, especially the murders, were most all allegedly committed by Group A members. Though the Court is aware that certain Group A members (Francesco Inzerillo, for example) are not accused of any violent acts, division into two groups does minimize the prejudicial spillover effects of alleged acts of violence.

Group B consists of what the government refers to in overt acts 9 and 10 as "secondary wholesale distributors" or those who "oversaw and facilitated the transportation, smuggling and storage of multiple kilogram quantities of narcotics...." Group B generally has less cohesion than Group A in terms of overlapping evidence. Yet the Court is unwilling to divide into even smaller trials a group of individuals who were found by the Grand Jury as participating together in a single narcotics conspiracy. The division made by the Court should significantly reduce the time spent by certain defendants listening to evidence with no relation to their case, and minimize the prejudicial spillover effects of being tried in one large group.

### III.  OTHER MOTIONS

#### 1.  Motions to Dismiss for Duplicity and Multiplicity

■ Defendants Joseph LaRosa and Salvatore LoBuglio move the Court to dismiss the first two counts of the indictment as being duplicitous and multiplicitous. First, the defendants argue that the first two counts of the indictment charge more than one conspiracy and that they are therefore duplicitous. Second, they argue that since the first two counts refer to identical transactions, it would violate the rule against multiplicitous charges by subjecting a defendant to prosecution under both counts. Each of these arguments will be considered in turn.

Under Fed.R.Crim.P. 7(c), the government is permitted to charge one or more specified means of committing a criminal offense in a single count of an indictment. Rule 7(c) allows that two or more acts, each

of which would constitute an offense standing alone, may be joined in a single count where "the offenses joined bear a relationship to one another and may be said to constitute a continuing course of conduct...." *United States v. Pavloski*, 574 F.2d 933, 936 (7th Cir.1978). A count of an indictment should only be ruled impermissibly duplicitous when the policy goals underlying the doctrine are offended—to wit, if a general verdict of guilty might actually conceal contrary findings as to different alleged crimes, or if an appropriate basis for sentencing is not provided. *United States v. Margiotta*, 646 F.2d 729, 732–33 (2d Cir.1981).

Defendants LaRosa and LoBuglio argue that their extremely minor roles in the alleged conspiracies demonstrate by necessity the existence of more than one conspiracy. It is true that neither defendant is mentioned in any overt act occurring before 1986. The government argues in response that the two defendants are contesting "what is strictly a matter of proof, not pleading." Government memorandum of law at 140. The Court agrees that in this case, the government should be permitted to go to trial on the pending indictment. Only after the Court has been made more aware of the evidence will it be in a position to decide whether counts one and two are impermissibly duplicitous.

The government is not allowed to divide into two or more counts what should have properly been charged in a single count. To allow the government to bring multiple counts where only one should have been charged would unfairly affect the defendant at sentencing. The test for determining whether two offenses are sufficiently distinct to allow the government to bring separate charges under different statutes is set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932):

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not....

*See Albernaz v. United States*, 450 U.S. 333, 337–38, 101 S.Ct. 1137, 1141–42, 67 L.Ed.2d 275 (1981); *United States v. Biasucci*, 786 F.2d 504, 515–16 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986). The rule is clearly set that conspiracies to import and distribute narcotics are properly charged separately. *See United States v. Benevento*, 836 F.2d 60, 72 (2d Cir.1987). Even when the overt acts pertaining to one conspiracy are incorporated into the charge for a second conspiracy, the charges are properly brought separately.

### 2. Defendant LoBuglio's Suppression Motion

■ Salvatore LoBuglio moves the Court to suppress physical evidence seized from his home on December 1, 1988 pursuant to a warrant issued by Judge Mark A. Costantino. LoBuglio argues that while the warrant stated that the affiant, Special Agent John G. Nemec, Jr., had reason to believe that evidence related to illegal drug transactions were hidden at LoBuglio's home, a close examination of the supporting affidavit reveals no such basis for a finding of probable cause to search LoBuglio's home.

Special Agent Nemec's affidavit describes LoBuglio's associations with alleged mafia members and his familial relationship to two convicted heroin dealers. More specifically, the affidavit sets forth the facts of LoBuglio's meetings, conversations and heroin transactions with an undercover agent working out of Buffalo, New York, and LoBuglio's frequentings of the Caffe Giardino. Special Agent Nemec details his experience as an FBI Special Agent assigned to the Organized Crime Drug Enforcement Task Force and states that his belief is based on his "training, experience, participation in other narcotics investigations, and discussions with other narcotics investigators."

To be valid, a search warrant must be supported by a showing of probable cause that evidence of criminal activity will be found during the search. "[P]robable cause

requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). The belief that there is probable cause need not "be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983); *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir.1983). "The process does not deal with hard certainties, but with probabilities.... [T]he evidence ... must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Texas v. Brown, supra*, 460 U.S. at 472, 103 S.Ct. at 1543.

The Court hereby finds that Special Agent Nemec's affidavit did provide probable cause for Judge Costantino's issuance of the search warrant for defendant LoBuglio's home. First-hand knowledge of the fact that evidence of drug trafficking was to be found at LoBuglio's residence was not necessary for the warrant to issue. Rather, Judge Costantino had to decide, based on Special Agent Nemec's affidavit, that under the totality of the circumstances, probable cause existed that evidence of criminal activity would be found at LoBuglio's home. *See Illinois v. Gates, supra*, 462 U.S. at 241, 103 S.Ct. at 2333. What was known about LoBuglio at that time, coupled with his relationship to organized crime family members, provided this probable cause. Defendant LoBuglio's motion to suppress the evidence seized from his home on December 1, 1988 is denied.

## CONCLUSION

Defendant Giuseppe Gambino's motions to dismiss the first, second, and third counts of the indictment against him on double jeopardy grounds are denied. Defendant Gambino's motion to bar the government from introducing evidence of the 1980 heroin importation scheme, alleged in overt acts 11–18, to prove count one of the indictment against him on collateral estoppel grounds is granted. Defendant Gambino's motion to bar the government from introducing evidence of the 1980 heroin importation scheme, alleged in overt acts 11–18, to prove count two of the indictment against him is denied.

Defendant Matteo Romano's motions to dismiss counts one, two, and seven of the indictment against him are denied.

Defendant Emanuele Adamita's motions to dismiss the indictment against him on double jeopardy grounds is denied.

Pursuant to the severance motions of defendants Lorenzo Mannino, Emanuele Adamita, Francesco Inzerillo, Joseph LaRosa, Salvatore LoBuglio, Giuseppe D'Amico, Francesco Cipriano, Salvatore Candela, and Carmelo Guarnera, the defendants will be divided into two groups for trial. One group will consist of defendants Giuseppe Gambino, Lorenzo Mannino, Francesco Inzerillo, Matteo Romano, and Emanuele Adamita. The other group will consist of defendants Joseph LaRosa, Salvatore LoBuglio, Giuseppe D'Amico, Salvatore D'Amico, Francesco Cipriano, Salvatore Candela, and Carmelo Guarnera.

The motions of defendants Jospeh LaRosa and Salvatore LoBuglio to dismiss the first two counts of the indictment against them on the grounds of duplicity and multiplicity are denied.

Defendant Salvatore LoBuglio's motion to suppress physical evidence seized from his home pursuant to a warrant on December 1, 1988 is denied.

SO ORDERED.